38 F.3d 1279
 30 Fed.R.Serv.3d 492
 INTERNATIONAL ORE & FERTILIZER CORP.,
Plaintiff-Appellee-Cross-Appellant,
v.
SGS CONTROL SERVICES, INC., Defendant-Appellant-Cross-Appellee,
and
Charles B. Updike, Esq. and Scott M. Riemer, Esq.,
Appellants-Cross-Appellees.
 Nos. 1480, 1481 and 1709, Dockets 93-9046, 93-9332 and 94-7084.
 United States Court of Appeals,
Second Circuit.
 Argued April 25, 1994.
Decided Oct. 24, 1994.
 
 Michael E. Schoeman and Charles B. Updike, New York City (Scott M. Riemer, Schoeman, Marsh & Updike, of counsel), for defendant-appellant-cross-appellee SGS Control Services, Inc. and appellants-cross-appellees Charles B. Updike and Scott M. Riemer.
 Richard H. Sommer, New York City (J. Scot Provan, Robert A. Milana, Kirlin, Campbell, Meadows & Keating, of counsel), for plaintiff-appellee-cross-appellant.
 Before: VAN GRAAFEILAND and WINTER, Circuit Judges, and MISHLER*, District Judge.
 WINTER, Circuit Judge:
 
 
 1
 SGS Control Services, Inc. ("SGS") appeals from Judge Tenney's order awarding $713,666.27 to International Ore & Fertilizer Corp. ("Interore") on the grounds that SGS negligently misrepresented the cleanliness of three ship's cargo holds resulting in contamination and other damage to the cargo. Interore cross-appeals from the district court's finding of contributory negligence and the consequent halving of damages. SGS's counsel also appeal from the district court's award of Fed.R.Civ.P. 11 sanctions for the making of repetitive motions.
 
 
 2
 We affirm but on rather different grounds. We believe that any duty that SGS owed to Interore arose from a contract between the parties to inspect the cargo holds and that SGS is not liable in tort. However, we also conclude that SGS breached its contract with Interore and that Interore would ordinarily be entitled to full damages. However, there has been no cross-appeal from the district court's dismissal of the contract claim, and we therefore leave the smaller judgment in place. We affirm the imposition of Rule 11 sanctions.
 
 BACKGROUND
 
 3
 Interore, a Delaware corporation with its principal place of business in New York City is, as its name suggests, an international corporation specializing in the trading of fertilizer products. Interore contracted to sell 22,202 metric tons of compound phosphate fertilizers to East Coast Fertilizer Company Ltd. ("East Coast"), a New Zealand corporation, on a cost and freight basis for $4,118,287. Interore chartered the M/V ADELINA to transport the fertilizer from Sweden to Tampa, Florida, and from Tampa to Napier, New Zealand. The agreement with East Coast required Interore to have an independent hold inspector certify the condition of the holds prior to loading the fertilizer. Interore contracted with SGS, as it had several hundred times previously, to inspect the ADELINA's holds and provide such a certificate. Interore confirmed the oral contract by telex, which read in relevant part: "PLS ACT OUR BEHALF PERFORMING INSPECTION, SAMPLING AND ANALYSIS. PLS ISSUE FLWG DOCS: 1) CERT OF HOLD INSPECTION, CONFIRMING VSLS HOLDS WERE CLEAN, DRY AND SUITABLE...." Interore paid SGS $150 for the inspection of the ADELINA's three holds loaded at Tampa.
 
 
 4
 The ADELINA has five cargo holds, each approximately eighty-one by eighty-seven feet square and forty-seven feet high, separated fore and aft by vertical bulkheads. The most forward hold, hold one, is slightly narrower. On the port and starboard sides of each hold are vertical ribs protruding two feet from the side of the hull and extending from the top of the hold to where an angled section of the hold begins approximately eight feet from the floor. Horizontal bars, called stringers, are attached at regular intervals to the front of the vertical ribs, and vertical pipes are nested between some of the ribs, each protected by horizontal bars fastened to the front of the ribs. Each hold has a large, square hatch opening at the top, measuring approximately forty-one by twenty-eight feet on hold one and fifty-five by thirty-nine feet on the other holds.
 
 
 5
 The ADELINA's previous cargo was coal, but the penultimate cargo had been barley. Although the crew cleaned and painted the holds following the discharge of the coal, they failed to remove a substantial amount of barley grains trapped in the pockets behind the stringers. The inspection of holds one and four in Sweden, performed by SGS's Swedish affiliate, lasted approximately forty-five minutes, during which the inspector descended into the holds and inspected the stringers and the hatch covers from below. The inspector also inquired of the crew as to the vessel's prior cargoes. The inspector certified holds one and four as clean, dry, and suitable for loading.
 
 
 6
 SGS's subcontractor, Captain Peter Luard, who had four years of experience in hold inspections, performed the Tampa inspection of holds two, three, and five in the early morning hours of July 2, 1985. Between 1:45 a.m. and 2:15 a.m., Luard inspected the three holds, spending approximately ten minutes in each hold. He climbed down the aft ladders and walked the floors, inspecting the stringers and overhead deck beams. Luard did not attempt to look behind the stringers. Following his visual inspection, he was informed of the previous cargoes by the crew but did not return to the holds. At 2:15 a.m., Luard completed a document on SGS letterhead titled "Certificate of Readiness" which read:
 
 Certificate of Readiness
 
 7
 THIS IS TO CERTIFY that the undersigned Marine Surveyor did, at the request of ______ on behalf of ______ did attend on board the M.V. Adelina of 16356.78 Gross Tons, Port of Registry PIRAEUS, whereof CAPT. MATSELOS P. is Master and now lying at GARDINER TERMINAL for the purpose of surveying the following cargo holds Nos 2, 3 and 5.
 
 
 8
 Said cargo compartments AND HATCH COVERS have been surveyed and found suitable to load a cargo of PHOSPHATE this time and date.
 
 DATE July 2nd 1985
 TIME PASSED 0215
 PETER F. LUARD
 
 9
 for SURVEYOR
 
 
 10
 SGS CONTROL SERVICES INC.
 
 VALID ONLY AT PORT OF ISSUANCE
 Member of the SGS Group
 
 11
 ALL INSPECTIONS ARE CARRIED OUT TO THE BEST OF OUR KNOWLEDGE AND ABILITY AND OUR RESPONSIBILITY IS LIMITED TO THE EXERCISE OF REASONABLE CARE [italics designate handwriting]
 
 
 12
 Following Luard's issuance of this certificate, the ADELINA loaded holds two, three and five with fertilizer and sailed for New Zealand.
 
 
 13
 Upon arrival in New Zealand on August 1, 1985, officials of the New Zealand Ministry of Agriculture and Fisheries ("MAF") discovered that the fertilizer was contaminated with barley and barred its discharge unless East Coast notified all buyers of the contamination and took steps to prevent it from being used in barley-growing areas. East Coast refused to do so or to accept the shipment, and the fertilizer remained aboard the ADELINA. Interore hired New Zealand surveyors who found the barley lodged in the stringers and hatch covers. Following futile attempts to find other buyers in Australia or Southeast Asia, Interore shipped the fertilizer to Antwerp, Belgium, where it was sold off in small lots. During this process Interore incurred damages in costs and lost value of $959,375.44.
 
 
 14
 Interore brought the present action against SGS alleging breach of contract, breach of warranty, negligence, and negligent misrepresentation. In a pre-trial order, the district court bifurcated the trial into, first, a bench trial generally concerning liability issues, and, second, a hearing before Chief Magistrate Judge Gershon concerning "[a]ll issues associated with damages." The order lists the issues to be tried in the first phase as:
 
 
 15
 whether the inspection of holds 2, 3, and 5 by SGS/Peter Luard which resulted in the issuance by SGS Control Services of a Certificate that those holds were clean, dry and fit for the intended cargo was conducted in a proper and workmanlike manner using reasonable care and professional skill; whether SGS Control Services breached its contract with Interore to conduct a proper and workmanlike hold survey: whether SGS breached any warranties owed to Interore and whether SGS misrepresented the condition of holds 2, 3, and 5 as clean, dry and fit for the intended cargo.
 
 
 16
 Following the bench trial, the district court held that under New York law Interore could not recover on its contract claim because, "[t]he low contract price and informal dealings between the parties indicates that they did not attempt to allocate all the risks. Therefore, the court is justified in allocating them fairly." International Ore & Fertilizer Corp. v. SGS Control Servs., 743 F.Supp. 250, 257-58 (S.D.N.Y.1990) ("Interore I "). In so holding, the district court relied upon the opinion in Vitol Trading S.A. v. SGS Control Services, 874 F.2d 76, 81 (2d Cir.1989). The district court rejected Interore's negligence claim because SGS "did not have a duty to perform any particular kind of inspection, except as required under the contract," and, therefore, "there can be no independent tort liability for failing to take certain steps as part of that inspection." Interore I, 743 F.Supp. at 258. However, the district court held that SGS was liable for negligent misrepresentation for issuing the inaccurate certification of the cleanliness and suitability of the holds, but apportioned half of the liability to Interore for its failure to inform SGS that "the slightest amount of foreign matter could contaminate the cargo" in the eyes of the vigilant New Zealand MAF. Id. at 259-60.
 
 
 17
 Following this ruling, Chief Magistrate Judge Gershon held a conference at which the parties disputed whether the district court had resolved the issue of proximate cause. Chief Magistrate Judge Gershon then referred the case back to the district court. The district court stated that Chief Magistrate Judge Gershon could "take into consideration whether the plaintiff took reasonable steps to diminish any damages," and could consider, "[i]f the plaintiff's partial fault contributed to the damages, namely, the failure to provide a [Lloyd's Certificate of Cleanliness] document...." However, the district court also cautioned SGS that any attempt to push further than these "limited" issues, "smells too much of trying to open up a trial because you forgot to do something at the time of the trial."
 
 
 18
 In her report and recommendation to the district court, Chief Magistrate Judge Gershon observed that the resolution of liability had necessarily also determined proximate cause, citing Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 159 (2d Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993). International Ore & Fertilizer Corp. v. SGS Control Servs., 828 F.Supp. 1098, 1106 (S.D.N.Y.1993) ("Interore II "). SGS filed objections to this ruling, arguing that Interore I "clearly required the second phase of the trial to determine the damages 'resulting from ' the contamination of the fertilizer." (SGS's emphasis). In Interore II, 828 F.Supp. at 1100, the district court adopted Chief Magistrate Judge Gershon's report and recommendation in full, ruling that, "the liability phase of the trial did in fact address the causation issues."
 
 
 19
 Following this ruling, SGS moved for a new trial pursuant to Fed.R.Civ.P. 59 and for amended or supplemental findings of fact pursuant to Fed.R.Civ.P. 52. SGS again argued that it had not been allowed to offer all its evidence regarding proximate causation. Interore opposed both motions and requested sanctions pursuant to Fed.R.Civ.P. 11. The district court granted Interore's motion based on "the groundless and repetitive nature of defense counsel's motion." International Ore & Fertilizer Corp. v. SGS Control Servs., No. 87 Civ. 6391 (CHT), 1993 WL 438902 at * 2 (S.D.N.Y. Oct. 28, 1993) ("Interore III "). SGS and its counsel then brought the present appeal.
 
 DISCUSSION
 
 20
 We briefly summarize our holding. SGS attacks the judgment on the ground that the tort of negligent misrepresentation cannot be the basis of liability where its sole legal duties to Interore arose entirely out of a contract. This is so, SGS argues, whether resort is had to federal maritime law, see East River S.S. Corp. v. Transamerica Delaval Inc., 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986), or to New York law, see Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 521 N.Y.S.2d 653, 516 N.E.2d 190 (1987).[1] We agree. However, we believe that Interore was entitled to recover full damages on its contract claim, which was dismissed by the district court. Interore has limited its cross-appeal to the finding that it was contributorily negligent and has thus not challenged the dismissal of its contract claim. Nevertheless, we may uphold the validity of a judgment on any ground, whether or not a cross-appeal has been filed. We may not, however, enlarge a money judgment absent such a cross-appeal. We therefore affirm.
 
 
 21
 1. Breach of Contract and Negligent Misrepresentation
 
 
 22
 We agree with SGS that East River, 476 U.S. 858, 106 S.Ct. 2295, and Clark-Fitzpatrick, 516 N.E.2d 190, compel the holding that any duty owed by SGS to Interore must be derived from the contract and that the negligent misrepresentation claim, which sounds in tort and entails a duty independent of the contract, should have been dismissed. However, we disagree with the district court that SGS was not liable for full damages for breach of contract. Under the contract, SGS was to inspect the ADELINA's holds and, if appropriate, certify that they were "clean, dry and suitable" for the loading of phosphate. SGS was obliged by the Certificate, and by an implied duty to perform the contract in a workmanlike fashion, see Mayer Boat Works v. Bright Marine Basin, 265 F.Supp. 352, 355 (E.D.N.Y.1966); Lunn v. Silfies, 106 Misc.2d 41, 431 N.Y.S.2d 282, 284 (Sup.Ct.1980), to carry out this inspection with "reasonable care," a duty that the district court's opinion makes clear was not performed. Indeed, it is not consistent to find negligent misrepresentation on the ground that Luard "knew, or should have known, that his limited inspection did not provide a valid basis upon which to state that the hold was, in fact, free of all possible contaminants," Interore I, 743 F.Supp. at 259, while also holding that SGS was not liable for breach of contract for certifying after the very same inspection that the holds were "clean, dry and suitable" for the loading of phosphate.
 
 
 23
 In dismissing the contract claim, the district court relied upon Vitol Trading S.A. v. SGS Control Services, 874 F.2d 76 (2d Cir.1989). However, the portion of Vitol relied upon represented the views of only one judge. That portion stated that SGS, the same defendant as in this case, was not liable for the full measure of damages on a contract. The portion relied upon reasoned that when a chemical tester "ha[s] no notice of potential special damages" stemming from the failure to conduct an accurate test and "as a rational economic actor ... it would have charged substantially more for its testing services," if it knew, id. at 81, SGS could not be liable for $500,000 in damages on a contract for which it received only a $220 fee. As the other members of the Vitol panel noted in their separate opinions, these statements were dicta in which they did not join. Id. at 82. Moreover, that portion of the Vitol opinion cannot be reconciled with the controlling New York case Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275 (1922), which we believe also reflects federal maritime law. In Glanzer, the New York Court of Appeals held independent weighers liable for special damages above the contract fee for negligent mismeasurement of commodities. The court stated that the buyers' justifiable reliance on the certificates of proper weight "was not an indirect or collateral consequence of the action of the weighers. It was a consequence which, to the weighers' knowledge, was the end and aim of the transaction." Id. 135 N.E. at 275. Similarly, SGS's performance of an accurate inspection rather than a cursory one was "the end and aim of the transaction."
 
 
 24
 The fact that SGS charged a seemingly low fee relative to potential liability hardly suggests that the parties failed to contemplate SGS's bearing the risk of a negligent inspection. Indeed, the Certificate expressly "limited" SGS's "responsibility ... to the exercise of reasonable care." SGS performs similar professional services on a frequently recurring basis and can insure against liability for inaccurate inspections which result in major damage to cargo. Then, SGS can set its prices accordingly. SGS and Interore are sophisticated repeat players in a competitive market for inspection services. We do not agree with our dissenting colleague that the parties here had an informal arrangement that obscured from SGS the consequences of a negligent performance of its contract. SGS is a professional organization that continuously performs specialized inspections and issues formal written "Certificate[s] of Readiness" necessary to contracts of sale involving goods to be transported by sea. Interore was required by its contract with East Coast to obtain such a written certificate, and there is no significance to the fact that its request to SGS for the certificate was by phone and telex. The parties had a business relationship that involved hundreds of such transactions. There is thus no reason to treat the inspection at issue as the equivalent to a one-time-hiring of a stranger to mow one's lawn for $5 with resultant property damage in the thousands of dollars. SGS is a professional organization that issues formal certificates essential to commerce that inspections have been properly done. It is fully aware that a negligent inspection may cause the loss of an entire cargo. That is why parties to sales of goods to be transported by sea require such certificates. See generally Glanzer. We see no reason whatsoever, therefore, why SGS is not liable for Interore's consequential damages as a result of its breach.
 
 
 25
 Our recent decision in Sundance Cruises Corp. v. American Bureau of Shipping, 7 F.3d 1077 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1399, 128 L.Ed.2d 72 (1994), is not to the contrary. Sundance was an action for damages on a contract for the classification for insurance purposes of an ocean-going passenger vessel. The court held that the disparity between the fee charged on the contract and damages sought disclosed that the parties did not foresee the risk of such liability. However, the purpose of the contractual obligation of the ship classification society in Sundance contrasts markedly with that of the inspector in Vitol and in the present case. Sundance likened the suit against the classification society to a case in which "one who causes a vehicle accident ... then sues the Motor Vehicle Bureau for damages to his car because it issued him a driver's license that falsely represented his fitness to drive." 7 F.3d at 1084. In Sundance, the court therefore concluded that "the purpose of the classification certificate is not to guarantee safety, but merely to permit [the ship owner] to take advantage of the insurance rates available to a classed vessel." Id. The purpose of the inspection in this case, however, was precisely to guarantee the condition of the hold so as to insure the preservation of the cargo. There is no other reason to perform such an inspection and no other reason to pay for one, whatever the amount.
 
 2. Failure to Cross-Appeal
 
 26
 As noted, however, Interore failed to cross-appeal from the dismissal of its claim for breach of contract. The general rule in a case in which a party fails to cross-appeal and an appellate court would otherwise have held in its favor is that:
 
 
 27
 [A] party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the case is brought here by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter not dealt with below. But it is likewise settled that the appellee may, without taking a cross-appeal, urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.
 
 
 28
 United States v. American Ry. Express Co., 265 U.S. 425, 435, 44 S.Ct. 560, 563-64, 68 L.Ed. 1087 (1924). The Supreme Court elaborated on the Railway Express rule in Morley Construction Co. v. Maryland Casualty Co., 300 U.S. 185, 57 S.Ct. 325, 81 L.Ed. 593 (1937), where it held that an appellee who had not cross-appealed could not " 'attack the decree with a view ... to enlarging his own rights.' " 300 U.S. at 191, 57 S.Ct. at 328 (quoting Railway Express, 265 U.S. at 435, 44 S.Ct. at 564). Findings will, therefore, not be altered on a non-cross-appealing appellee's behalf "where a revision of the findings carries with it as an incident a revision of the judgment." Id. In short, an appellate court may not "give a new measure of relief" to the appellee. Id. 300 U.S. at 193, 57 S.Ct. at 328-29.
 
 
 29
 This rule has been modified in some circuits by treating the requirement of a cross-appeal as one of practice rather than jurisdiction, allowing the court to use its discretion to consider unappealed grounds so as to exercise its "broad power 'to make such disposition ... as justice requires.' " In re Barnett, 124 F.2d 1005, 1009 (2d Cir.1942) (ellipsis in original) (citation omitted). Compare id. with Shipp v. General Motors Corp., 750 F.2d 418, 428 (5th Cir.1985) (treating cross-appeal requirement as jurisdictional); Schildhaus v. Moe, 319 F.2d 587, 588 (2d Cir.1963) (per curiam) (declining to review district court's findings without cross-appeal). The Barnett court stressed that it was sitting in equity. Generally, however, these cases have involved multiple parties where only one of several plaintiffs or defendants failed to cross-appeal. In each case, the court included the non-cross-appellant in the amended judgment so as to preserve "fairness."
 
 
 30
 Several of our recent decisions have referred without elaboration to the discretionary nature of our power to disregard the cross-appeal requirement. Texport Oil Co. v. M/V Amolyntos, 11 F.3d 361, 366 (2d Cir.1993) (permitting late-filed cross-appeal); Finkielstain v. Seidel, 857 F.2d 893, 895 (2d Cir.1988). These cases conform to the general rule that the appellee may seek to sustain a judgment on any grounds with support in the record. Jaffke v. Dunham, 352 U.S. 280, 281, 77 S.Ct. 307, 308-09, 1 L.Ed.2d 314 (1957) (per curiam) (cross-appeal not necessary to rule on admissibility of affidavit stricken by district court); Arlinghaus v. Ritenour, 622 F.2d 629, 638 (2d Cir.) (substituting grounds for affirmance without cross-appeal), cert. denied, 449 U.S. 1013, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980); Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1206 (2d Cir.1978) (observing that grant of injunctive relief may be affirmed on a claim dismissed by district court). This rule applies even when the alternate grounds were not asserted until the court's questioning at oral argument. Arlinghaus, 622 F.2d at 638. We may, therefore, uphold the finding of liability on a breach of contract theory.
 
 
 31
 We do not believe, however, that, given the present procedural circumstances, Interore is entitled to its full damages. Although an appellee who has not cross-appealed may urge alternative grounds for affirmance, it may not seek to enlarge its rights under the judgment by enlarging the amount of damages or scope of equitable relief. See, e.g., Zapico v. Bucyrus-Erie Co., 579 F.2d 714, 725 (2d Cir.1978) (non-cross-appealing defendant-appellee cannot raise claim that judgments should be reduced). We may, therefore, uphold the present judgment but we may not enlarge it to award Interore its full contract damages.
 
 
 32
 Interore did cross-appeal from the finding that it was contributorily negligent. Its sole claim in that regard is that the record does not provide a factual basis for that finding. Because we believe that SGS's liability is grounded solely in contract rather than tort, Interore's contributory negligence would be irrelevant. Arguably, we might have the power to review the finding of contributory negligence and, if we concluded that it lacked support in the record, vacate and restore to Interore the full measure of damages suffered. The restoration of the full measure, however, would be on contract grounds and thus would stretch the principles regarding cross-appeals beyond the bounds of our power.
 
 
 33
 We therefore affirm the judgment on breach of contract grounds.
 
 3. Rule 11 Sanctions
 
 34
 We review the imposition of sanctions under Rule 11 for abuse of discretion. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990). Such an abuse would include "an erroneous view of the law or ... a clearly erroneous assessment of the evidence." Id.
 
 
 35
 Appellants Updike and Riemer contend that the imposition of Rule 11 sanctions violated due process because they were given neither notice nor an opportunity to be heard. See Securities Indus. Ass'n v. Clarke, 898 F.2d 318, 322 (2d Cir.1990). However, they submitted an affidavit in response to Interore's opposition to SGS's motion for a new trial and supplemental findings. Interore's opposition included a request for Rule 11 sanctions. In their affidavit appellants made no mention of Interore's request for sanctions. Appellants thus had notice from Interore's motion, and an opportunity to be heard by opposing the motion in the affidavit submitted. Appellants having failed to respond to the motion for sanctions, the district court had no reason to exercise its discretion to hold an evidentiary hearing that had not been requested.
 
 
 36
 Appellants raise numerous objections on the merits to the imposition of sanctions, but, even viewing the record in the light most favorable to them, we cannot say that the district court abused its discretion. The district court had already ruled that fifty percent of the damages would be attributable to SGS because of Interore's contributory negligence. Appellants' argument that proximate cause was "associated with damages" and thus reserved for the second phase of the trial was thus an afterthought bordering on frivolousness.
 
 
 37
 Appellants rely upon Rule 59, which governs amendment of judgments by the district court. "The major grounds justifying reconsideration" include "the need to correct a clear error or prevent manifest injustice." Virgin Atlantic Airways v. National Mediation Bd., 956 F.2d 1245, 1255 (2d Cir.) (citation omitted), cert. denied, --- U.S. ----, 113 S.Ct. 67, 121 L.Ed.2d 34 (1992). They claim that the district court had never clearly ruled on the proximate cause issue, and that while they acknowledge that the issue had been raised, they claim that "a formal request was necessary to raise the issue properly."
 
 
 38
 Although parties may certainly request a new trial or amended findings where clear errors or manifest injustice threaten, in the absence of such corruption of the judicial processes, "where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." Zdanok v. Glidden Co., 327 F.2d 944, 953 (2d Cir.), cert. denied, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298 (1964). As the district court noted, SGS's arguments regarding proximate cause and related factual issues had received detailed attention at several junctures including SGS's objection to the magistrate judge's report and recommendation and in a full hearing before the district court on June 26, 1991. The district court's conclusion that SGS's motion "caused unnecessary delay to [the] proceedings and is not well grounded either in fact or in a good faith belief in the modification of existing law," Interore III at * 2, is therefore not an abuse of discretion.
 
 CONCLUSION
 
 39
 We have examined SGS's other arguments and find them meritless. We affirm the judgment against SGS and the award of sanctions.
 
 
 40
 MISHLER, District Judge, concurring in part and dissenting in part:
 
 
 41
 I agree with the majority's ruling on the tort claim of International Ore & Fertilizer Corp. ("Interore") based on SGS Control Service's ("SGS") misrepresentation for issuing the inaccurate certification of the cleanliness and suitability of the Adelina's holds. I agree that the court may consider Interore's breach of contract claim even though Interore failed to file a cross-appeal from the district court's dismissal of the contract claim. I also agree with the affirmance of the Rule 11 sanctions. I disagree with the majority's holding that damages of $713,666.27 (reduced by 50% on a finding of Interore's contributory negligence) is the measure of damages on the breach of contract claim.
 
 DISCUSSION
 FACT FINDINGS BY THE DISTRICT COURT
 
 42
 In denying recovery under Interore's breach of contract theory of liability, Judge Tenney found that the disproportion of the charge for the inspection, i.e., $150, and the damages sought,[1] and the informality in entering into the contract as the basis for arriving at that determination. Judge Tenney found that in addition to the
 
 
 43
 disparity between the contract price and the damages ... the parties reached their agreement over the phone, and the plaintiff simply confirmed it with a one-page telex. The telex merely requests defendant to perform the various services and to issue a series of documents. It is devoid of any mention of liability. The low control price and informal dealings between the parties indicates that they did not attempt to allocate all of the risks. Therefore, the court is justified in allocating them fairly. Accordingly, it finds that plaintiff should not recover compensatory damages on the contract.
 
 
 44
 International Ore & Fertilizer Corp. v. SGS Control Servs., 743 F.Supp. 250, 257-58 (S.D.N.Y.1990) ("Interore I ") (Drawing its analysis from Restatement (Second) of Contracts Sec. 351 cmt. f (1979)).
 
 
 45
 The Restatement (Second) of Contracts Sec. 351(3) (1981) notes the wide discretion that the trial court has in a breach of contract claim in limiting damages for foreseeable loss "if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation."
 
 Comment f states:
 
 46
 It is not always in the interest of justice to require the party in breach to pay damages for all of the foreseeable loss that he has caused. There are unusual instances in which it appears from the circumstances either that the parties assumed that one of them would not bear the risk of a particular loss or that, although there was no such assumption, it would be unjust to put the risk on that party. One such circumstance is an extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question. The fact that the price is relatively small suggests that it was not intended to cover the risk of such liability. Another such circumstance is an informality of dealing, including the absence of a detailed written contract, which indicates that there was no careful attempt to allocate all of the risks. The fact that the parties did not attempt to delineate with precision all of the risks justifies a court in attempting to allocate them fairly.
 
 
 47
 Restatement (Second) of Contracts Sec. 351 cmt. f (1981) (emphasis added).
 
 
 48
 Judge Tenney made the factual finding that the damages were disproportionate to the contract price.[2] Interore I, 743 F.Supp. at 257. The court made this finding because the great disparity between the contract price and the damages indicated that the parties did not intend to allocate the risks.[3] Additionally, the court relied on the informality of the contract to reach its conclusion. SGS and Interore made an oral agreement that was confirmed by a one-page telex. Interore I, 743 F.Supp. at 252, 257. The agreement failed to specify the manner of inspection or mention liability. Id. at 257. Judge Tenney concluded that the parties did not have a "meeting of the minds" regarding the scope of the inspection and the parties did not anticipate the risk of loss. Id. at 256-58. These fact findings are binding on this court unless they are clearly erroneous. Fed.R.Civ.P. 52(a).
 
 INTERPRETING SUNDANCE
 
 49
 Sundance Cruises Corp. v. American Bureau of Shipping, 7 F.3d 1077 (2d Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1399, 128 L.Ed.2d 72 (1994) does not support the majority's analysis. The court in Sundance denied compensatory damages to Sundance, the ship owner. The court agreed with Judge Knapp's finding that "Sundance had failed to show any damage flowing from issuance of the classification certificate." Id. at 1084. In other words, Sundance failed to prove causation. The court stated two additional grounds for denying compensatory damages to Sundance:
 
 
 50
 First, the great disparity between the fee charged ($85,000) by ABS for its services and the damages sought by Sundance ($264,000,000) is strong evidence that such a result was not intended by the parties. We can only conclude that the small fees charged could not have been intended to cover the risk of such liability; the ship classification industry could not continue to exist under such terms. See, e.g., Vitol Trading S.A., Inc., v. SGS Control Servs., Inc., 874 F.2d 76, 81-82 (2d Cir.1989) (quoting Restatement (Second) of Contracts Sec. 351 cmt. f: "fact that price [charged] is relatively small suggests that it was not intended to cover the risk of such liability").
 
 
 51
 Second, and probably most significantly, the shipowner, not ABS, is ultimately responsible for and in control of the activities aboard ship.... This ongoing responsibility for the vessel is supplemented by the maritime-law requirement that the shipowner has a nondelegable duty to furnish a seaworthy vessel. Great American Ins. Co. v. Bureau Veritas, 338 F.Supp. 999 (S.D.N.Y.1972), aff'd, 478 F.2d 235 (2d Cir.1973).
 
 
 52
 Id.
 
 
 53
 The reference in Sundance to the damages sought and the fee charged as "strong evidence that such a result was not intended by the parties," and that the shipowner "is ultimately responsible for and in control of the activities aboard ship" indicates that the lack of causation is not the sole basis for denying damages. The Sundance court also cited Sec. 351 of the Restatement which allows a court to limit damages for foreseeable loss "if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation." Restatement (Second) of Contracts Sec. 351(3) (1981). The very fact that the Sundance court discussed Sec. 351 reveals that the court extended its reasoning to cases in which causation is proven. In fact, Sec. 351 is only applicable if the court first finds that there were damages caused by the breach. Only then would a court decide whether to limit disproportionate damages. Thus, the Sundance decision supports the reasoning of Interore I that a court, in the interests of justice, may limit damages to avoid disproportionate compensation, if causation is proven.
 
 
 54
 The additional grounds upon which the Sundance court relied are analogous to those in Interore I and therefore dictate the same result. First, Judge Tenney discussed the great disparity between the contract price and the damages. Interore sought damages of $2,400,000 on a contract price of $150, a ratio of 16,000 to one.[4] Interore I, 743 F.Supp. at 257. The actual damages in this case were $713,666.27 compared to a contract price of $150, a ratio of 4,758 to one.
 
 
 55
 Second, the principle articulated in Sundance that the shipowner is ultimately responsible for the activities on a ship is also applicable to Interore, the charterer of the Adelina. Sundance, 7 F.3d at 1084; Great American Ins. Co., 338 F.Supp. at 1015. As the charterer, Interore was more likely than SGS to anticipate the risk of liability. Interore knew or had reason to know that the New Zealand authorities would reject the shipment if there had been minimal contamination of the fertilizer. Interore I, 743 F.Supp. at 260. Interore was in the better position to avert the risk because it was in the fertilizer business and had shipped fertilizer to New Zealand in the past. Id. Even though SGS was responsible for assuring that the hold was clean, Interore could have minimized the risk of loss by advising SGS of New Zealand's strict requirements. Id.
 
 
 56
 I would direct dismissal of the complaint.
 
 
 
 *
 The Honorable Jacob Mishler, District Judge, United States District Court for the Eastern District of New York, sitting by designation
 
 
 [1]
 On appeal, the parties dispute the proper source of law to govern our resolution of this matter. SGS argues for the application of general federal maritime law. Interore argues for the application of New York law and points out that the district court noted that both parties had assumed New York law controlled. Interore I, 743 F.Supp. at 255 n. 4. Because we believe that the disposition of this case would be the same under either federal maritime or New York law, we do not address the question
 
 
 [1]
 Judge Tenney used the demand of $2,400,000 in the complaint
 
 
 [2]
 This finding is not listed with the other factual findings because it was ultimately disposed of when Judge Tenney dismissed the contract claim
 
 
 [3]
 In Sundance Cruises Corp. v. American Bureau of Shipping, 799 F.Supp. 363, 376 (S.D.N.Y.1992), the district court made the same factual finding that the parties did not assume the risk of loss in making a contract in which a great disparity between the contract price and the damages resulted. The Sundance district court cited Interore I for making the same factual finding. Id. The Second Circuit adhered to the Sundance district court's factual finding. Sundance, 7 F.3d at 1084
 
 
 [4]
 Although Judge Tenney based this ratio on the pleadings, he acknowledged that the actual damages may be much lower